UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINQUE ALLEN,

    Plaintiff,

v.

File No. 1:12-cv-67

HON. ROBERT HOLMES BELL

CITY OF BENTON HARBOR and THE ESTATE
OF JARED GRAVES,

    Defendants.
_____/

## **OPINION**

    This action includes a civil rights claim brought under 42 U.S.C. § 1983 and various state-law claims arising from the same operative facts. This matter is before the Court on Defendant City of Benton Harbor's (Defendant)[1] motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) and for summary judgment under Fed. R. Civ. P. 56 (Dkt. No. 95) as to all of Plaintiff's claims against it. Because Defendants have filed their answers, the pleadings are closed. *See* Fed. R. Civ. P. 7(a). Defendant's motion is properly treated as a motion for judgment on the pleadings under Rule 12(c), rather than 12(6)(b), on the grounds that Plaintiff's complaint fails to state a claim upon which relief can be granted. However the same standards apply whether the motion is treated as one for dismissal or judgment on the pleadings. *Sensations v City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). Plaintiff has filed a voluminous response (Dkt. No. 102) to which Defendant has replied (Dkt. No. 110).

    Three issues are before the Court. First, whether Plaintiff has pled facts sufficient to state a

---

[1] Defendant Estate of Jared Graves took no part in the consideration of the present motion, and thus Defendant City of Benton Harbor is referred to as Defendant hereinafter.

claim under the Fourth and Eighth Amendments. Second, whether there is a genuine issue of fact as to whether Defendant had a policy or custom that led to Plaintiff's constitutional deprivation, such that Defendant should be subjected to municipal liability under *Monell*. Finally, whether Defendant is entitled to immunity from Plaintiff's state-law claims under Michigan's Governmental Immunity Act.

For the reasons that follow, the Court grants-in-part and denies-in-part Defendant's motion for judgment on the pleadings and grants Defendant's motion for summary judgment.

## I.

The nature of this case requires discussion of facts stretching nearly two decades before Plaintiff suffered her alleged constitutional injury. Plaintiff has put at issue Decedent-Defendant Jared Graves's (Decedent) entire employment history, in addition to the alleged constitutional harms he inflicted on her as a Benton Harbor Police Officer.

**A.     Decedent's Employment with the Benton Harbor Police Department**

1.     *Employment History*

Decedent first applied to the Benton Harbor Police Department[2] (BHPD) in October of 1993 (Def.'s Br., Dkt. No. 96 at 4). State and federal criminal history searches revealed no felony convictions (*id.*). Although Decedent's evaluation scores placed him in the marginal range (Pl's Ex. D, Dkt. No. 103-1), he was hired in June 1994 (Pl's Resp., Dkt. No. 102 at 11).

Decedent left the BHPD and worked as a probation officer for the Berrien County juvenile court system from 1997–98 (Def.'s Br., Dkt. No. 96 at 5). He was a racing investigator for the

---

[2] The City of Benton Harbor is a defendant because it is a municipality organized according to the laws of the State of Michigan and operates the Benton Harbor Police Department pursuant to laws of Michigan (*see* Compl., Dkt. No. 1 at ¶ 2).

Michigan Office of Racing Commission from 1998–2000 (Def.'s Br., Dkt. No. 96 at 5; Pl.'s Resp., Dkt. No. 102 at 11–12). From 2000–01, he worked in a program administered by Benton Harbor area schools and Lake Michigan college (Def.'s Br., Dkt. No. 96 at 5). Decedent was re-hired by BHPD in 2001 as a court officer (*id.*). He was not at that time certified to be a patrol officer.

The BHPD Police Chief approached Decedent in 2004 about becoming re-certified as a patrol officer (*id.* at 7). Decedent indicated he had no criminal history, which a background inquiry with the State of Michigan and FBI confirmed (*id.*). Decedent took the necessary classes to become re-certified (*id.*). Decedent underwent psychological evaluation as part of the re-certification process, and the psychologist recommended him as being particularly well-qualified to be a patrol officer (*id.* at 7–8). Decedent was subsequently re-certified in 2004 (*id.* at 8). He was put on one-year probation, which is standard for new hires (Pl.'s Resp., Dkt. No. 102 at 14).

Decedent was a member of the patrol officer's union. As such, he was subject to progressive discipline. Pertinent here are the provisions of the collective bargaining agreement that provided prior infractions older than one year could not be considered in disciplining an officer, unless the prior infraction was directly related to the charged conduct (Def.'s Br., Dkt. No. 96 at 8–9).

2. *Decedent's Alleged Misconduct and Defendant's Response*

    a. <u>1994: Allegation of destroying evidence</u>

In 2002, Decedent testified against another officer accused of destroying drug evidence (Reply, Dkt. No. 110 at 4). That officer accused Decedent of also destroying drugs while Decedent was his supervisor in 1994 (*id.* at 5; Def.'s Ex. 26, Dkt. No. 111-2). An investigator found this charge to be without basis and consequently no disciplinary action was taken against Decedent (Def.'s Ex. 26, Dkt. No. 111-2).

3

### b. 1997: Weapons Discharge

Decedent went through a fitness evaluation in 1997 after discharging his weapon in the course of duty (Def.'s Br., Dkt. No. 96 at 4). A psychologist found that Decedent was fit for duty and able to perform the essential functions of a police officer (*id.* at 5). However, Decedent decided to leave the BHPD for the Berrien County juvenile court system in early 1997 (*id.*).

### c. 2002: Missing Bond Money

In September 2002, the Berrien County Criminal Court advised the BHPD that money posted by a defendant was missing (*id.* at 5). Decedent was the court officer at the time (*id.* at 6). BHPD conducted an investigation that concluded that Decedent had failed to follow department policy for handling bond money, but did not conclude that Decedent had stolen the bond money at issue (*id.*). Decedent personally replaced the missing money and was suspended for one day without pay (*id.*).

### d. 2003: Ticket Fixing

In 2003, after the Berrien County Court reported that traffic tickets it had processed had not been enforced, Decedent admitted to telling members of his church that he would "take care" of their citations (*id.* at 6). Decedent admitted his intention was not to deliver the citations to the court (*id.*). Decedent's supervisor (Officer Mingo) reported the incident to the Prosecuting Attorney's office, but the Prosecutor decided not to press charges (*id.*). Mingo subsequently recommended to the Chief of Police that Decedent be suspended for five days without pay (*id.*). This punishment was approved and Decedent was suspended for five days without pay (*id.*). Decedent was warned that if he engaged in like conduct again, he would be terminated (Pl.'s Resp., Dkt. No. 102 at 13).

### e. 2005: Donaghue Harassment

In 2005, Decedent was accused by a female officer of making inappropriate remarks and

4

physical contact (Def.'s Br., Dkt. No. 96 at 9; Pl.'s Resp., Dkt. No. 102 at 14). The female officer's accusation, which was corroborated by other officers, was that Decedent made comments about the size of her buttocks and breasts (Def.'s Br., Dkt. No. 96 at 9; Pl.'s Resp., Dkt. No. 102 at 14). On a separate occasion, Decedent congratulated the female officer for making an arrest by hugging her from the side and kissing her on the cheek (Def.'s Br., Dkt. No. 96 at 9; Pl.'s Resp., Dkt. No. 102 at 14). After an investigation, Decedent was given a two-day unpaid suspension and warned that if he engaged in like conduct again, he would be terminated (Def.'s Br., Dkt. No. 96 at 10; Pl.'s Resp., Dkt. No. 102 at 15).

      f.      2007: Surreptitious Photography

Sometime in 2007, Decedent allegedly took a picture with his camera phone of a female dispatcher's clothed buttocks (Pl.'s Resp., Dkt. No. 102 at16; Def.'s Br., Dkt. No. 96 at 11). This incident was not uncovered at the time but rather during a subsequent investigation discussed in Section I(A)(2)(g), *infra* (Pl.'s Resp., Dkt. No. 102 at 16).

      g.      2008: Allegation of Sexual Relationship with High School Student

In 2008, Mingo became aware that another officer (Officer Williams) may have been involved in a sexual relationship with a high school student (Def.'s Br., Dkt. No. 96 at 10). During the course of the investigation, Mingo interviewed the student in question, and asked her if any other officers were involved with high school students (*id.*). The student said that Decedent had solicited her on several occasions, including requests that she perform oral sex on him, but that she had never engaged in sexual conduct with Decedent (*id.*). She advised that a second student may have had sexual relations with Decedent. When questioned, the second student denied such involvement and refused to assist in the investigation (*id.*).

5

Mingo conducted a full investigation into the allegations of sexual misconduct on the part of Decedent and Williams (*id.*). Mingo became aware at this time of the allegation that Decedent had photographed the buttocks of a female dispatcher, as discussed *supra* (*id.* at 11). Mingo could not, however, substantiate that Decedent had a sexual relationship with a high school student (*id.*). When Mingo contacted the prosecutor's office to report the alleged sexual relationship, he was informed that because the students were over sixteen, there could be no criminal prosecution (*id.*). Mingo, along with the Chief of Police and the city manager, decided that in light of Decedent's previous inappropriate behavior toward a female officer, Decedent would be suspended for thirty days without pay and given a clear admonition that similar substantiated conduct would lead to termination (*id.*). Williams was also disciplined for his inappropriate sexual relationship (*id.*).

      h.      2009: Confession of Sex Addiction

In 2009, Decedent met with a police captain with whom he was friends (*id.* at 11–12, Pl.'s Resp., Dkt. No. 102 at 19). During this conversation, Decedent confessed that he was in treatment for sex addiction and that his marriage was in trouble (Def.'s Br., Dkt. No. 96 at 12; Pl.'s Resp., Dkt. No. 102 at 19). The captain did not report this confession because he interpreted it as a personal matter, and instead prayed with Decedent "for [him] to be healed" (Def.'s Br., Dkt. No. 96 at 12; Pl.'s Resp., Dkt. No. 102 at 19). Defendant and Plaintiff only became aware of this confession when the captain was deposed for the instant matter (Def.'s Br., Dkt. No. 96 at 12).

**B.    Decedent's Alleged Sexual Assault Against Plaintiff**

In October 2011, Plaintiff was a resident of Harbor Towers apartments, a housing project located near the BHPD. Decedent was sent to investigate possible drug use in the apartments. Decedent discovered a small amount of marijuana in Plaintiff's possession, which he confiscated.

Decedent falsely reported to BHPD that he had detected the odor of marijuana, but could not locate the odor's source.

Decedent later contacted Plaintiff and instructed her to come to the police station. He led her to a storage room, and threatened to charge her with possession of marijuana if she did not perform oral sex on him. Plaintiff complied and he returned the marijuana to her.

About a month later, Decedent was at Harbor Towers doing paperwork in an office used by the BHPD for that purpose. He encountered Plaintiff and told her to meet him in the office. Decedent again instructed Plaintiff to perform oral sex on him, and then engaged in vaginal intercourse with her. During this encounter, Plaintiff put Decedent's revolver in her mouth and contemplated suicide, but Decedent stopped her.[3]

Plaintiff reported the sexual assaults to her family, who in turn reported them to the BHPD. When confronted with the accusations, Decedent denied forcing himself on Plaintiff, and instead averred that the sexual relationship had been consensual. Based on the seriousness of the allegations, Mingo gave Decedent the option of being terminated immediately or resigning. Decedent chose to resign, and was subsequently charged by the prosecutor for criminal sexual conduct and delivery of marijuana. Decedent committed suicide before he could be prosecuted.

---

[3] Defendant City of Benton Harbor admitted in its Answer (Dkt. No. 10) that Decedent sexually assaulted Plaintiff at the police station, but has neither admitted nor denied that Decedent sexually assaulted Plaintiff at the apartment complex. Defendant Estate of Jared Graves has neither admitted or denied any of the factual allegations of the complaint (Dkt. No. 17). Therefore, the facts recited above are the facts viewed in the light most favorable to Plaintiff. They are not findings of fact and do not preclude Defendants from challenging them later.

## II.

A.  **Motion for Judgment on the Pleadings**

In reviewing a Rule 12(c) motion to for judgment on the pleadings, the Court must "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff,'" but "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing how the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this statement is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. 678. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc.*

8

*v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1583 (2012) (quoting *Iqbal*, 556 U.S. at 677). Where a complaint pleads facts that are merely consistent with a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Defendant argues, on the basis of the Sixth Circuit's decision in *Doe v. Claiborne Cnty.*, 103 F.3d 495, 506–07, (6th Cir. 1996), that Plaintiff's claims of sexual assault at the hands of a state actor are properly brought under the Due Process Clause of the Fourteenth Amendment (Pl.'s Br., Dkt. No. 96 at 12-13). Defendant argues, therefore, that Plaintiff's claims under the Fourth and Eighth Amendment must be dismissed (*id.*). Defendant does not, however, contend that Plaintiff has failed to allege facts sufficient to show a constitutional deprivation. Plaintiff argues that under *Graham v. Connor*, 490 U.S. 386, 387 (1989), that the Fourteenth Amendment is not an exclusive remedy for the violations of her rights, and that because she alleges excessive force was used against her, she can maintain her Fourth and Eighth Amendment claims.

There can be little question that at the time Plaintiff alleges she was assaulted, she was "seized" within the meaning of the Fourth Amendment because a reasonable person would not have felt under the circumstances that she was free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J.) (adopted in *INS v. Delgado*, 466 U.S. 210, 215 (1984)) ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Therefore, because she has alleged that Decedent used more force than was reasonably necessary in effectuating her seizure, she has stated a claim under the Fourth Amendment.

However, Plaintiff has failed to state a claim under the Eighth Amendment. See *Ingraham*

9

*v. Wright*, 430 U.S. 651, 664–66 (1977) (stating that Eighth Amendment protections attach only to those actually convicted of crimes, and not to pretrial detainees or arrestees). Because Plaintiff had not been convicted of a crime when Decedent allegedly assaulted her, she cannot, as a matter of law, state a claim under the Eighth Amendment against any defendant in this case.

For these reasons, the Court holds that Plaintiff has failed to state a claim under the Eighth Amendment, but has stated a claim under the Fourth Amendment. Therefore, her Eighth Amendment claim will be dismissed with respect to both Defendants.

**B.      Motion for Summary Judgment**

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the moving party will not carry the burden of proof at trial, the party must identify "those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotations omitted). A defendant moving for summary judgment is not required, however, to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir.

2007)). Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

Congress has authorized private causes of actions against state actors for constitutional deprivations in 42 U.S.C. § 1983. The Supreme Court, in evaluating claims against municipalities for the constitutional torts of its employees, has rejected categorically a *respondeat superior* theory of liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997).

Rather, a plaintiff must show that a municipality "through its deliberate conduct . . . was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. This requires a showing of a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* Such a standard requires a plaintiff to identify "a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* at 403 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Identifying a policy ensures that the municipality is only held liable for deprivations that result from the decisions of those authorized to act on the municipality's behalf. *Id.* A custom not approved by a decision maker can subject a municipality to liability "on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404 (citing *Monell*, 436 U.S. at 690–91).

In the instant case, Defendant argues that it is entitled to judgment as a matter of law because Plaintiff has failed to establish that a policy or custom of the BHPD was the moving force behind Plaintiff's constitutional injury. Plaintiff contends that Defendant failed to properly screen, train, or supervise Decedent. Defendant counters that even if it failed to screen, train, or supervise Decedent, such failure does not demonstrate a policy or custom of the BHPD on which municipal liability can rest. The material facts regarding the events that transpired during Decedent's employment are not in dispute, nor is the fact that Plaintiff suffered a constitutional deprivation at the hands of Decedent.[4] The dispute in this case is over the interpretation and legal import of those facts. Therefore, the only issue is whether Plaintiff has identified a policy or custom of Defendant that caused her constitutional deprivation.

Plaintiff's theory of municipal liability, summarized in the sub-heading of her principle argument, is that Defendant "had a custom, policy, or practice of failing to investigate, punish, or supervise [Decedent]" (Pl.'s Resp., Dkt. No. 102 at 24). The failure to investigate theory is essentially a theory of failure to properly screen before hiring. Plaintiff argues that Defendant failed to properly train Decedent. Finally, Plaintiff's failure to punish or supervise theory is that Defendant failed to terminate Decedent before he had an opportunity to assault her. The Court will consider these arguments in turn.

1.  *Failure to Properly Screen*

"To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the

---

[4] Defendant City of Benton Harbor admits that Plaintiff was sexually assaulted at the police station in its Answer (Dkt. No. 10), and concedes that such violates her substantive due process rights under the Fourteenth Amendment (*see* Def.'s Br., Dkt. No. 96).

particular injury alleged." *Brown*, 520 U.S. at 410. Here, the gravamen of Plaintiff's argument is that Defendant failed to adequately evaluate Decedent's fitness to be a police officer when it rehired him in 2001 and when he was certified as a patrol officer in 2004. Plaintiff's argument is without merit.

The Supreme Court has warned that a claim basing municipal liability on a failure to screen before hiring poses "the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision." *Brown*, 520 U.S. at 415. Such cases raise "serious federalism concerns," *id.*, in that a plaintiff raising such a claim asks a federal court to review the hiring process of a co-sovereign State. Consequently the Supreme Court has held that municipal liability for an inadequate hiring process will lie "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Id.* at 411.

Here, Plaintiff asserts that Decedent "should not have been hired by [Defendant] as a police officer" in 1994 because he was rated "at or below marginal" on his assessment (Pl.'s Resp., Dkt. No. 102 at 11). Plaintiff further asserts that Defendant "re-hired [Decedent] without conducting *any* background investigation" of what she claims are two prior terminations that occurred between 1997 and 2001 (*id.* at 12). Plaintiff has not, however, pointed the Court to evidence that Decedent was ever terminated from the jobs he held in 1997–2001. The only support of that contention, is Plaintiff's own deposition in which she describes the attacks Decedent allegedly made against her (*id.*). Her deposition does not mention Decedent's prior employment, nor the process by which he was re-hired by Defendant. Plaintiff also takes issue with the screening process, arguing that Decedent should have been subject to a more rigorous psychological investigation. Plaintiff, however, has pointed to

13

no evidence that Defendant failed to properly investigate Decedent before re-hiring him in 2001, outside of her own conjecture about what should have been done.

Defendant, moreover, has submitted evidence that there was no adverse information about Decedent to find from his former employers. Specifically, Defendant points to records requests and Freedom of Information Act inquiries placed to Decedent's former employers that show no evidence of improper actions by Decedent at any of his employment stations between 1997 and 2001 (Def.'s Br., Dkt. No. 96 at 5). Further, a background check performed in 2005, before Decedent was re-certified as a patrol officer, revealed no state or federal criminal history. Even if Defendant had applied the scrutiny to Decedent that Plaintiff now argues it should have, Plaintiff has provided no evidence that Defendant would have uncovered information about Decedent that "would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Brown*, 520 U.S. at 411. Specifically, Plaintiff has failed to show evidence that at the time Decedent was hired, the plainly obvious consequence of his hiring would be that he would abuse his position in order to sexually assault a citizen. There is therefore no genuine issue of material fact with regard to Plaintiff's claim that Defendant should be subject to *Monell* liability merely for hiring Decedent.

2.  *Failure to Train*

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. *Connick v. Thompson,* ___ U.S. ___, 131 S. Ct. 1350, 1359 (2011). In order for liability to attach, a plaintiff must show that "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with

whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton*, 489 U.S. at 388).

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360 (citing *Brown*, 520 U.S. at 407). The training program, however, must be "necessarily intended to apply over time to multiple employees. *Brown*, 520 U.S. at 407 (citing *Canton* 489 U.S. at 390).

Here, Plaintiff argues that the lack of an official sexual misconduct policy on the part of Defendant shows that Defendant was deliberately indifferent to the "danger that [Decedent] might rape someone like Plaintiff" (Pl.'s Resp., Dkt. No. 102 at 30). Plaintiff asserts that Defendant had "knowledge of [Decedent's] extensive history of sexual misconduct" and thus was on notice of a "pattern of prior incidents of similar sexual abuse" that made obvious the need for training to prevent constitutional violations (*id.* at 30–31).

In *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006), the Sixth Circuit held that a plaintiff had created a genuine fact issue over the city's failure to train its officers. *Id.* at 754. In that case the City did not have a program in place to train police officers on the handling of exculpatory evidence. *Id.* The plaintiff's due process rights were violated when police officers withheld exculpatory evidence in the plaintiff's criminal case. *Id.* The court held the "custom of failing to train its officers on the handling of exculpatory material is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experience by [p]laintiff." *Id.*

The facts of the present case are distinguishable from *Gregory*. The unconstitutional conduct imputed to the city in that case was of a technical, legal nature (i.e., handling of exculpatory

15

evidence) that by its very nature requires more than common knowledge. The average person would not know the legal standards involved in handling the exculpatory evidence at issue in *Gregory*. Where, as here, the unconstitutional conduct (i.e., sexual assault by a police officer) is so egregious as to be obviously wrong, it cannot fairly be said that the municipality is liable for failing to train officers not to engage in such behavior. Further, Plaintiff has not shown a *pattern* of inappropriate sexual conduct on the part of police officers that was caused by a failure to train. Rather, she argues that Defendant failed to train *this particular* officer based on what Defendant *should have known* about his personal propensities. Plaintiff invites the Court to impute the type of *respondeat superior* liability on Defendant that the Supreme Court has flatly rejected. There is therefore no genuine issue of material fact with regard to Plaintiff's failure to train theory and Defendant is entitled to judgment as a matter of law.

3.    *Failure to Act*

Plaintiff also argues that Defendant failed to adequately discipline Decedent (Pl.'s Resp., Dkt. No. 102 at 27–29). At its core, Plaintiff's argument is that each and every act of alleged misconduct on the part of Decedent should have led to his termination, and that Defendant's failure to terminate him evinces deliberate indifference on the part of Defendant. Municipal liability cannot, however, be based on so broad a basis. Rather, a plaintiff must show deliberate indifference that is the "moving force" behind the constitutional injury. *See Brown*, 520 U.S. at 404. Even if Defendant turned a blind eye to Decedent stealing bond money, fixing parking tickets, and destroying evidence, tolerance of such is not deliberate indifference to a probability that Decedent would sexually assault an arrestee in the course of his duties.

In arguing that Defendant was deliberately indifferent for failing to terminate Decedent,

Plaintiff merely uses buzzwords from relevant Supreme Court cases and then cites the self-serving statements from her experts that mimic the same language. By casting her failure to discipline claims in this manner, Plaintiff is attempting to hold Defendant vicariously liable under a *respondeat superior* theory.

Whether Plaintiff's theory is cast as a failure to terminate, or a more general failure to properly discipline, the Sixth Circuit has given clear guidance on how to evaluate such "inaction" claims. To establish municipal liability based on a failure to act, a plaintiff must show (1) the existence of a clear and persistent pattern of municipal employees violating the federal rights of third parties; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) a direct casual link between the defendant's custom and the constitutional deprivation. *Powers v. Hamilton Cnty. Public Def. Comm'n,* 501 F.3d 592, 607 (6th Cir. 2007). Evaluation of these factors shows that Plaintiff's inaction theory lacks merit.

First, Plaintiff has failed to show a "clear and persistent" pattern of police officers violating federal rights, specifically the substantive due process rights of citizens not to be sexually assaulted by police officers. Rather, Plaintiff has identified a handful of isolated incidents in which Decedent and one other officer behaved inappropriately in the course of their duties. There has been no showing that police officers routinely abused their position to sexually assault citizens. Because there is no pattern of violations of which to be on notice, Plaintiff also fails to meet the second prong.

However, to the degree Defendant was aware of the sexual misconduct of Decedent and Officer Williams, it did not tacitly approve of, let alone condone, such. To the contrary, both Williams and Decedent were punished for their misdeeds in accordance with the terms of the union

17

contract and after due deliberation between the investigators, the chief of police, and the city manager. Because there was not a custom of condoning violations of federal rights, Plaintiff cannot show a direct causal link between her injury and Defendant's conduct.

For the foregoing reasons, Plaintiff has failed to demonstrate that there is a triable issue of fact with regard to Defendant's liability under *Monell*. Although Plaintiff's brief and supporting documents are filled with strident language condemning Defendant's actions with regard to Decedent, Plaintiff has failed to meet the "stringent culpability and causation requirements" necessary to establish municipal liability. *Brown*, 520 U.S. at 415. Moreover, while in hindsight the Court might be persuaded to agree with Plaintiff that there may have been "something [Defendant] 'could have done' to prevent" her victimization at Decedent's hands, such falls short of the strictures set in place by the Supreme Court. Indeed, a collection of "sloppy, or even reckless" oversights is insufficient to meet the high standard of showing Defendant was deliberately indifferent to Plaintiff's constitutional rights. *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996).

In sum, there are no genuine issues of material fact with regard to Plaintiff's section 1983 municipal liability claims against Defendant. Therefore Defendant is entitled to judgment as a matter of law on these claims.

**C.     Immunity from State Law Claims**

Defendant argues that Plaintiff's state law claims must be dismissed under Michigan's Governmental Immunity Act. Mich. Comp. Laws § 691.1407. Specifically, Defendant argues that under cases interpreting the Governmental Immunity Act, a municipality cannot be held liable for the intentional torts of its employees. Plaintiff argues that such immunity is only applicable when the torts take place when the employee is acting in the course of performing a government function.

The usual course of action when all federal claims are disposed of on summary judgment is

to dismiss state-law claims without prejudice. *See Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001). However, Michigan law in this area is clear: a municipality "cannot be held liable for the intentional torts of its employees." *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995) (citing *Alexander v. Riccinto*, 481 N.W.2d 6, 9 (Mich. Ct. App. 1991). Neither can a municipality be held liable for acts of employees that are outside the scope of performing a government function. *Alexander*, 481 N.W.2d at 9. Plaintiff states in her own response "[Decedent's] intentionally tortious action occurred after [Decedent's] exercise of . . . government function" (Pl.'s Reps., Dkt. No. 102 at 32). There is no dispute, therefore, that (1) Decedent's assaults against Plaintiff were intentional torts; and (2) that such assaults fell outside the scope of Decedent's government function. Because Michigan law on the matter is clear, in the interest of judicial economy, the Court holds that Defendant is entitled to immunity on Plaintiff's state-law claims, and such will be dismissed with prejudice.

### III.

For the foregoing reasons the Court holds that Plaintiff has stated a claim for relief under the Fourth Amendment, but not under the Eighth. The Court finds that the evidence, viewed in the light most favorable to Plaintiff, does not show that Defendant City of Benton Harbor had a policy or custom that was the moving force behind Plaintiff's alleged constitutional injury. Finally, the Court holds that Defendant is entitled to immunity on Plaintiff's state law claims. The Court will therefore enter summary judgment in favor of Defendant City of Benton Harbor on all of Plaintiff's claims.

The Court will issue an Order consistent with this Opinion.


Dated: December 12, 2013                         /s/ Robert Holmes Bell
                                                                                       ROBERT HOLMES BELL
                                                                                       UNITED STATES DISTRICT JUDGE